1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

| JANET MORENO-TORO,<br><br>                    Plaintiff,<br><br>             v.<br><br>CITY OF LAKE STEVENS, et al.<br><br>                    Defendants. | CASE NO. C13-1723JLR<br><br>ORDER GRANTING SUMMARY JUDGMENT |

15

## I.   INTRODUCTION

16

17

18

19

20

21

This matter comes before the court on Defendants' motion for summary judgment. (Mot. (Dkt. # 25).)  Defendants include the City of Lake Stevens ("Lake Stevens") and four Lake Stevens police officers:  Jared Wachveitl, Ron Brooks, Steve Warbis, and Dean Thomas.  Plaintiff Janet Moreno-Toro alleges that these four police officers executed an unreasonable search and seizure of her house.  For the following reasons, the court GRANTS Defendants' motion for summary judgment.

22

## II.   BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1]  This case began when Officer Warbis received a report that a stolen generator had potentially been located.  (Cochran Decl. (Dkt. # 20) Ex. 2 ("Warbis Rep.") at 1.)  The generator in question belonged to Douglas Montzingo, and had previously been stolen from him by an unknown person.  (*Id.*)  Mr. Montzingo and his wife had located the generator listed for sale on the internet website "Craigslist," and contacted the police in an effort to recover it.  (*Id.*)  The generator was listed for sale by Ms. Moreno-Toro's husband,  Cesar Zalvaza.  (*Id.*; Cochran Decl. Ex. 3 ("Wachveitl Rep.") at 1.)

At the police department, Officer Wachveitl overheard Officer Warbis' conversation with Mr. Montzingo.  (Wachveitl Rep. at 1.)  He recognized the address associated with the Craigslist ad, and remembered that he had previously investigated Mr. Zalvaza for trafficking stolen tools in 2010.  (*Id.*; Wachveitl. Decl. (Dkt. # 26) ¶ 7.)  Officer Wachveitl was unable to complete that investigation due to time constraints imposed by his duties as a patrol officer at that time, but he recalled that the police had suspected Mr. Zalvaza of operating out of the same Lake Stevens address as a "fence" for new and used power tools.  (Wachveitl. Decl. ¶ 7; Wachveitl Rep. at 1.)  He also recalled that Mr. Zalvaza drove a new red Jeep.  (Wachveitl. Decl. ¶ 7.)

---

[1] Both parties, in their respective motions for summary judgment, relied on a series of police reports written by the officers who are now defendants in this suit, and Ms. Moreno-Toro does not object to reliance on these reports.  (*Compare* Mot. *with* Plf. MSJ (Dkt. # 19).)

1    Officer Warbis instructed Mr. Montzingo to tell Mr. Zalvaza that he was interested

2    in purchasing the generator, and to make an appointment to see it.  (Warbis Rep. at 1.)

3    On the day of the appointment, February 3, 2013, Officer Warbis, Officer Wachveitl, and

4    Officer Brooks met with Mr. and Ms. Montzingo in a church parking lot near Mr.

5    Zalvaza's house and advised them to determine if the generator for sale was in fact their

6    generator.  (Warbis Rep. at 1.)

7    At 11:30 a.m., the Montzingos drove to Mr. Zalvaza's house, met with both Mr.

8    Zalvaza and Ms. Moreno-Toro, inspected the generator, and confirmed it was the stolen

9    unit.  (*Id.* at 1-2.)  In particular, Mr. Montzingo confirmed that the serial number on the

10   generator for sale matched the serial number of his stolen generator.  (*Id.*)  The

11   Montzingos left Mr. Zalvaza and Ms. Moreno-Toro on the pretext that they needed to

12   obtain the cash necessary to purchase the generator; in fact they returned to the parking

13   lot to meet the officers a second time.  (*Id.* at 2; *see generally* Wachveitl Decl. Exs. 3, 4

14   (Mr. and Ms. Montzingo's witness statements).)

15   While they were meeting with the officers, however, Mr. Zalvaza drove by the

16   parking lot in his red Jeep.  (Wachveitl Rep. at 1; Brooks Rep. (Dkt. # 20) Ex. 4 at 1.)

17   Both Mr. Montzingo and Officer Wachveitl recognized Mr. Zalvaza.  (Wachveitl Rep. at

18   1; Brooks Rep. at 1.)  The officers realized that their meeting was visible from the road.

19   (Wachveitl Rep. at 1.)  They grew concerned that if Mr. Zalvaza recognized that the

20   officers were talking to the Montzingos, he would return to the house to destroy evidence

21   of his suspected trafficking activity or, alternatively, call Ms. Moreno-Toro and warn her

22   to do the same.  (*Id.*)

ORDER- 3

1    To prevent this, Officer Brooks went immediately to Mr. Zalvaza's residence.

2    (Brooks Rep. at 1.)  When he arrived, he observed that the garage door was open and the

3    generator in question was still in the garage.  (*Id.*)  The garage was attached to the

4    residence.  (Wachveitl Rep. at 2.)  Officer Brooks also observed numerous other "high-

5    quality yard tools, chainsaws, weed eaters, generators, and air compressors" in the

6    garage.  (Brooks Rep. at 1.)  Officer Brooks knocked on the door of the house and Ms.

7    Moreno-Toro answered.  (*Id.*)  He asked if Mr. Zalvaza was home, and Ms. Moreno-Toro

8    responded that he was not, but he would be back soon.  (*Id.*)  Officer Brooks told her that

9    the police suspected Mr. Zalavaza was in possession of a stolen generator, and that they

10   intended to secure the residence pending a search warrant.  (*Id.*; Cochran Decl. Ex. 1

11   ("Moreno-Toro Decl.") ¶ 3.)  Ms. Moreno-Toro warned Officer Brooks not to enter the

12   house or garage without a warrant.  (Moreno-Toro Decl. ¶ 3.)  He complied.  (Brooks

13   Rep. at 1.)

14        Shortly thereafter, Officer Wachveitl arrived on the scene.  (*Id.*; Moreno-Toro

15   Decl. ¶ 4.)  Officer Wachveitl "observed an excessive amount of power tools, equipment,

16   along with a few appliances," which he described as "more power tools and equipment

17   than several ordinary people may own combined."  (Wachveitl Rep. at 2 (emphasis

18   removed).)  Without entering the garage, he began taking photographs of the tools

19   through the open garage door.  (*Id.*; Moreno-Toro Decl. ¶ 4.)  At this point, Ms. Moreno-

20   Toro opened a door that connected the garage to the house and yelled at him to stay out

21   of the garage unless he had a warrant.  (Moreno-Toro Decl. ¶ 4; Wachveitl Rep. at 2.)

22

Officer Wachveitl was "taken aback" by Ms. Moreno-Toro's tone of voice. (Wachveitl Rep. at 2.) He reported: "She sounded as though she was angered by our presence at her residence. My training and experience as a police officer have taught me that few people talk to law enforcement in an aggressive manner like [Ms.] Moreno-Toro had just done." (*Id.*) If he had been in close quarters with Ms. Moreno-Toro, he "would have thought of her actions as a strong pre-attack indicator of possible future physical assault." (*Id.*) He concluded that Ms. Moreno-Toro was distrustful of him and Officer Brooks. (*Id.*) After realizing that the garage was connected to the house by a door, he grew concerned that Mr. Zalvaza could have told Ms. Moreno-Toro to quickly conceal property from the garage inside the house. (*Id.*) He was also worried that later someone could use the connecting door to ambush the officers while they were searching the garage. (*Id.*)

Officer Wachveitl went around to the front door and explained to Ms. Moreno-Toro that a search warrant for her residence was on its way, and that in the meantime she would be required to leave the residence. (*Id.*; Moreno-Toro Decl. ¶ 4.) At this time, he intended to request a search warrant for the entire residence. (Wachveitl Decl. at 2.) Ms. Moreno-Toro was holding a toddler who was feeling sick that day. (Moreno-Toro Decl. ¶ 2; Wachveitl Rep. at 3.) Officer Wachveitl told Ms. Moreno-Toro that he was going to look around her house to ensure no other persons remained inside. (Wachveitl Rep. at 3; Moreno-Toro Decl. ¶¶ 4-5.) He reported that he did so in order to confirm that no one inside the house could conceal or destroy evidence or plan an ambush of the officers when they returned with the search warrant. (Wachveitl Rep. at 2.) Ms. Moreno-Toro

1   reiterated that she did not consent to a search without a warrant.  (*Id.*)  Nonetheless,

2   Officer Wachveitl walked through the residence, followed by Ms. Moreno-Toro.  (*Id.*)

3   Officer Wachveitl inspected "the living room, bedrooms, closets, behind curtains, in the

4   showers, bathrooms, kitchen, laundry room, and master bedroom walk-in closet, and then

5   proceeded through [the] downstairs area and exited through the garage."  (*Id.*)  Ms.

6   Moreno-Toro testified that the search took about 20 minutes.[2]  (*Id.*)

7           At the conclusion of the search, Officer Wachveitl explained to Ms. Moreno-Toro

8   that it would take several hours to obtain the search warrant, and that in the meantime she

9   could not stay in her home.  (Wachveitl Rep. at 3.)  He informed her that she was free to

10  remain in the vehicle outside her home, and that if she needed any items for her child, an

11  officer would escort her into the house to retrieve them.  (*Id.*)  This instruction made Ms.

12  Moreno-Toro feel "very agitated and upset," but she complied.  (Moreno-Toro Decl. ¶ 6.)

13          Shortly thereafter, Mr. Zavalza returned to the scene, having been alerted to the

14  situation by Ms. Moreno-Toro.  (*Id.* ¶ 3; Wachveitl Rep. at 3.)  He claimed that he had

15  purchased the generator at a pawn shop, and that he would email the police a receipt.

16  (Wachveitl Rep. at 3.)  The police department, however, did not receive any such email

17  before the warrant for the residence issued.  (*Id.* at 5.)

18          Officer Wachveitl left to begin drafting an affidavit for a search warrant, and Mr.

19  Zalvaza and Ms. Moreno-Toro departed in separate cars.  (*Id.* at 4.)  Ms. Moreno-Toro,

20  

21          [2] Officer Wachveitl maintains that the search took only a "few minutes."  (Wachveitl Rep. at 3;
    Wachveitl. Decl. ¶ 20.)  For purposes of a motion for summary judgment, however, the court resolves all

22  factual disputes in favor of Ms. Moreno-Toro.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
    133, 150 (2000).

ORDER- 6

1   picked up her 17-year-old daughter from work at approximately 2:30 p.m. and returned to

2   the residence at approximately 3:00 p.m. (Moreno-Toro Decl. ¶ 7.) By then Officer

3   Warbis had arrived on the scene. (*Id.* ¶ 7.) Ms. Moreno-Toro told him that her daughter

4   needed to retrieve some clothes from inside the house. (*Id.*; Warbis Rep. at 2.) Officer

5   Warbis permitted the daughter to enter the house unaccompanied to change clothes.

6   (Warbis Rep. at 2; Moreno-Toro Decl. ¶ 7.) Ms. Moreno-Toro then left again, this time

7   in order to drop her daughter off at her friend's house, and returned approximately 10

8   minutes later. (Moreno-Toro Decl. ¶ 7.)

9        When Ms. Moreno-Toro returned, she demanded to be let back into the house, but

10  Officer Brooks refused to let her return unescorted. (*Id.* ¶ 7; Brooks Rep. at 1.) Ms.

11  Moreno-Toro later claimed that she only wanted to re-enter in order to obtain food and

12  diapers for her sick child. (Moreno-Toro Decl. ¶ 7.) Officer Brooks was concerned that

13  she was yelling at the officers, so he called the police department to check on the status of

14  the warrant. (Brooks Rep. at 2.) The police department informed him that the warrant

15  was in the process of being presented to a judge, and referred him to the prosecuting

16  attorney who had approved the warrant. (*Id.*) Officer Brooks asked the attorney whether

17  he could permit Ms. Moreno-Toro to return to the residence now that the warrant was on

18  its way. (*Id.*) The prosecuting attorney told him that, because the scope of the warrant

19  had been reduced to include only the garage, Ms. Moreno-Toro and the rest of the family

20  were free to re-enter the remainder of the house. (*Id.*)

21       Next, Officer Brooks fielded a call from dispatch, who informed him that Ms.

22  Moreno-Toro had called 911 to complain about the officers' presence at her residence,

ORDER- 7

1   and that Ms. Moreno-Toro's attorney was requesting to to speak to the officers.  (*Id.*;

2   Moreno-Toro Decl. ¶ 7.)  Officer Brooks attempted to reach Ms. Moreno-Toro's attorney,

3   but his call went unanswered.  (Brooks Rep. at 2.)  Accordingly, he walked over the Ms.

4   Moreno-Toro's car and informed her she was free to return to her house.  (*Id.*)  Shortly

5   thereafter, Officer Wachveitl arrived and served the search warrant on Ms. Moreno-Toro.

6   (*Id.*)

7          After leaving Ms. Moreno-Toro's residence, Officer Wachveitl had arrived at the

8   Lake Stevens Police Department at about 3:00 p.m.  (Wachveitl Rep. at 3.)  It took him

9   approximately two hours to draft the affidavit for the search warrant.  (*Id.*)  He enlisted

10  Officer Thomas to help him in his efforts.  (Cochran Decl. Ex. 6 ("Thomas Rep.") at 1.)

11  Officer Thomas searched Craigslist using the phone number Mr. Zalvazo had provided to

12  Mr. Montzingo.  (*Id.*)  He discovered ads for approximately $17,000.00 of additional

13  merchandise that Mr. Montzingo was attempting to sell.  (*Id.*)  Most of the merchandise

14  was power tools, including generators, paint sprayers, and other industrial equipment.

15  (*Id.*)  Officer Wachveitl checked an online database of pawned property, but was unable

16  to find any transaction by Mr. Zalvaza for a generator.  (Wachveitl Decl. Ex. 2 ("Aff. for

17  Warrant").)

18         Officer Wachveitl added all of this information to the warrant, as well as the

19  information that he had gathered during his previous investigation of Mr. Zalvaza.  (*Id.*)

20  While drafting the warrant, Officer Wachveitl decided "at the last minute" to request

21  permission to search only the garage.  (Wachveitl Rep. at 5.)  Although he personally

22  believed there was probable cause to search the entire residence—and the officers at the

1  house were operating under the assumption that a warrant would issue for the entire

2  residence—due to the time constraints, he wanted to ensure that a judge would approve

3  the warrant on the first try.  (*Id.*)

4       The warrant was reviewed and approved by the Snohomish County Prosecuting

5  Attorney's Office.  (*Id.*)  At about 3:20 p.m. Officer Wachveitl telephoned a Snohomish

6  County Superior Court Judge, and by 3:40 p.m. Officer Wachveitl met the Judge at his

7  residence, where the Judge approved and signed the search warrant.  (*Id.*; *see also id.* Ex.

8  3 ("Warrant"); Aff. for Warrant.)  Officer Wachveitl returned to Ms. Moreno-Toro's

9  house with the search warrant no later than 4:30 p.m.  (Thomas Rep. at 2; *see also*

10  Wachveitl Decl. ¶ 25 (discussing various police reports stating that he served the affidavit

11  between 4:00 and 4:30 p.m.))  At that point, Officers Thomas and Wachveitl proceeded

12  to search the garage pursuant to the warrant.  (Thomas Rep. at 2; Wachveitl Rep. at 6.)

13  They ultimately seized the Montzingos' generator, as well as a chainsaw that was

14  identified as stolen.  (Thomas Rep. at 2.)

15       As a result of that encounter, Ms. Moreno-Toro now brings this action against the

16  four officers and Lake Stevens.  (*See* Compl. (Dkt. # 2-2).)  Ms. Moreno-Toro asserts

17  claims under 42 U.S.C. § 1983 for violations of her federal constitutional rights, as well

18  as various state law claims and violations of the Washington State constitutions.  (*See id.*)

19  She claims Defendants are liable for two events:  (1) her exclusion from the residence

20  pending issuance of the search warrant, and (2) Officer Wachveitl's sweep of the

21  residence prior to receiving the warrant.  (*See id.*)  The court previously denied Ms.

22  Moreno-Toro's motion for summary judgment based on those two theories.  (*See* 5/28/14

1  Order (Dkt. # 24).)  The officers and Lake Stevens now move for summary judgment in

2  their favor.  (*See* Mot.)

3  ### III.    ANALYSIS

4  **A.    Summary Judgment Standard**

5      Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

6  where the moving party demonstrates (1) the absence of a genuine issue of material fact

7  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

8  317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

9  moving party bears the initial burden of showing the absence of a genuine issue of

10  material fact.  *Celotex*, 477 U.S. at 323.

11      If the moving party does not bear the ultimate burden of persuasion at trial, it can

12  show the absence of an issue of material fact in two ways: (1) by producing evidence

13  negating an essential element of the non-moving party's case, or, (2) by showing that the

14  nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

15  *Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  The

16  burden then shifts to the non-moving party to identify specific facts from which a

17  factfinder could reasonably find in the non-moving party's favor.  *Celotex*, 477 U.S. at

18  324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In determining whether

19  the factfinder could reasonably find in the non-moving party's favor, "the court must

20  draw all reasonable inferences in favor of the nonmoving party, and it may not make

21  credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing*

22  *Prods., Inc.*, 530 U.S. 133, 150 (2000).

**B.    Section 1983 Claims**

The court turns first to Ms. Moreno-Toro's claims, brought pursuant to 42 U.S.C. § 1983, that the officers violated her Fourth Amendment right to be free from unreasonable searches and seizures.  The court concludes that the officers are individually entitled to qualified immunity with respect to both their seizure and search of Ms. Moreno-Toro's residence.  For the time being, however, Ms. Moreno-Toro's claims against Lake Stevens remain viable.

**1.    Qualified immunity**

In the context of 28 U.S.C. § 1983 claims, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Stanton v. Sims,* 571 U.S. ----, 134 S.Ct. 3, 4-5 (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. ----, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Accordingly, an officer will be denied qualified immunity in a § 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Green v. City & Cnty. of San Fran.*, ---- F.3d. ----, 2014 WL

1   1876273, at *11 (9th Cir. May 12, 2014).  Courts have discretion to decide the order in

2   which to address the two prongs.  *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

3       Regarding the second prong, the plaintiff bears the "burden of demonstrating that

4   the right allegedly violated was clearly established at the time of the incident."  *Greene v.*

5   *Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009).  A government official's conduct violates

6   clearly established law when, "at the time of the challenged conduct, the contours of a

7   right are sufficiently clear that every reasonable official would have understood that what

8   he is doing violates that right."  *al-Kidd*, 131 S. Ct. at 2083.  In other words, "existing

9   precedent must have placed the statutory or constitutional question" confronted by the

10  official "beyond debate."  *Plumhoff v. Rickard*, ---- U.S. ----, 134 S. Ct. 2012, 2023

11  (2014) (citing *al-Kidd*, 131 S.Ct. at 2083-84).  This determination "must be undertaken in

12  light of the specific context of the case, not as a broad general proposition."  *Saucier v.*

13  *Katz*, 533 U.S. 194, 201 (2001); *see Plumhoff*, 134 S. Ct. at 2023 ("[W]e have repeatedly

14  told courts not to define clearly established law at a high level of generality, since doing

15  so avoids the crucial question whether the official acted reasonably in the particular

16  circumstances that he or she faced.") (internal punctuation omitted).  In the absence of

17  genuine issues of material fact, the second prong is a question of law to be determined by

18  the court.  *Green*, 2014 WL 1876273, at *11 (citing *Act Up!/Portland v. Bagley*, 988 F.2d

19  868, 873 (9th Cir. 1993)); *see also Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010).

20      With respect to both of Ms. Moreno's claims, this court exercises its discretion to

21  address the second prong of the qualified immunity test first.  *See Pearson*, 555 U.S. at

22  242.  Ms. Moreno-Toro's contention that determination of the second prong is a question

1   of fact for the jury to decide is, in this context, mistaken. (*See generally* Resp. (Dkt.

2   # 27).)  It is true that, in general, officers' conduct and the facts and circumstances within

3   the officers' knowledge are issues of fact to be determined by the factfinder if genuine

4   disputes of material fact exist.  *See Act Up!/Portland*, 988 F.2d at 873.  However, the

5   determination of whether those facts support an objective belief in the reasonableness of

6   the officers' conduct remains a question for the court.  *Id.*  This determination is not in

7   itself a factual issue that can preclude summary judgment.  *Id.*  Here, the facts underlying

8   Ms. Moreno-Toro's claim are almost entirely undisputed, and the court takes the few

9   disputed facts and all inferences in Ms. Moreno-Toro's favor.  *See Tolan v. Cotton*, 134

10  S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).  As such, the court can decide as a matter of

11  law whether the officers' conduct violated Ms. Moreno-Toro's clearly established

12  constitutional rights.  *See Hopkins v. Bonvicino*, 573 F.3d 752, 762-63 (9th Cir. 2009;

13  *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000); *Buzayan v. City of*

14  *Davis Police Dep't*, 431 F. App'x 551, 552 (9th Cir. 2011).

15      **2.  Seizure of Ms. Moreno-Toro's residence**

16      The court considers first the officers' seizure of Ms. Moreno-Toro's residence

17  pending receipt of a search warrant.  The Supreme Court set forth the test for determining

18  the reasonableness of seizing a residence pending a warrant in *Illinois v. McArthur*, 531

19  U.S. 326 (2001).  Under this test, courts must "balance the privacy-related and law

20  enforcement-related concerns using four factors:  (1) whether the police had probable

21  cause to believe that the . . . residence contained evidence of a crime or contraband; (2)

22  whether the police had good reason to fear that, unless restrained, the [inhabitants] would

destroy the evidence or contraband before the police could return with a warrant; (3)

whether the police made reasonable efforts to reconcile their law enforcement needs with

the demands of personal privacy; and (4) whether the police imposed the restraint for a

limited period of time—in other words, whether the time period was no longer than

reasonably necessary for the police, acting with diligence, to obtain the warrant." *United*

*States v. Song Ja Cha*, 597 F.3d 995, 1000 (9th Cir. 2010) (citing *MacArthur*, 531 U.S. at

330-31.)  Evaluating these factors in the context of the second prong of qualified

immunity, the court finds that a reasonable police officer applying *MacArthur* and its

progeny could conclude that the seizure of Ms. Moreno-Toro's residence pending a

warrant was lawful.  *See al-Kidd*, 131 S. Ct. at 2083.

The court turns first to the factor of probable cause.  "A police officer has probable

cause to conduct a search when the facts available to him would warrant a person of

reasonable caution in the belief that contraband or evidence of a crime is present."

*Florida v. Harris*, ---- U.S. ----, 133 S. Ct. 1050, 1055 (2013) (internal punctuation

omitted); *see also Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013).  The test for

probable cause is not reducible to "precise definition or quantification."  *Harris*, 133 S.

Ct. at 1055 (citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).  All that is required is

"the kind of 'fair probability' on which reasonable and prudent people, not legal

technicians, act."  *Id.* (citing *Gates*, 462 U.S. at 238.)  In evaluating whether this

"practical and common-sensical standard" is met, courts look to the totality of the

circumstances.  *Id.*; *see also Cameron*, 713 F.3d at 1018.

ORDER- 14

1    Here, the officers knew—based on two eyewitness accounts—that a stolen

2  generator was located on the premises of Ms. Moreno-Toro's property.  (*See* Wachveitl

3  Decl. Exs. 3, 4 (Mr. and Ms. Montzingo's witness statements).)  They also knew that Mr.

4  Zalvaza had previously been investigated for trafficking in stolen power tools.  (*See*

5  Wachveitl Rep. at 1; Warbis Rep. at 1.)  Furthermore, they personally observed an

6  "excessive amount" of power tools located at the residence.  (Brooks Rep. at 1;

7  Wachveitl Rep. at 2.)  And Mr. Zalvaza was unable to produce a receipt for the generator

8  when asked.  (Wachveitl Rep. at 3.)  As Ms. Moreno-Toro concedes, these facts would

9  warrant a person of reasonable caution in the belief that contraband or evidence of a

10  crime was present in the garage.  *See Harris*, 133 S. Ct. at 1055; (Resp. at 16.)

11    Ms. Moreno-Toro nevertheless contends, without citing to any supporting

12  authority, that probable cause did not extend to the remainder of the residence.  (*See*

13  Resp. at 16.)  This contention is incorrect.  The garage was connected to the house by a

14  doorway, and all of the facts before the officers pointed to a large-scale fencing

15  operation.  (*See* Brooks Rep. at 1; Wachveitl Rep. at 1-3.)  A reasonable officer could

16  certainly conclude that these facts give rise to a "fair probability" that some evidence

17  pertaining to the suspected trafficking scheme—if not stolen tools, then perhaps records

18  or money—was located inside the house.  *See United States v. Brooks*, 367 F.3d 1128,

19  1134 (9th Cir. 2004) ("[P]robable cause does not require a certainty, only a fair

20  probability or a substantial chance . . . .")  Indeed, in *United States v. Roberts*, the Ninth

21  Circuit held that probable cause to search a detached garage for marijuana extended to the

22  nearby residential dwelling because the suspect was in control of and used the entire

premises as a "single unit."  *See* 747 F.2d 537, 545 (9th Cir. 1984).  Because Ms.

Moreno-Toro and Mr. Zalvaza were in control of and used their house and attached

garage as a "single unit," that same reasoning applies here.  *See also United States v.*

*Frazin*, 780 F.2d 1461, 1467 (9th Cir. 1986) ("No reason exists to distinguish an attached

garage from the rest of a residence for Fourth Amendment purposes.")

   The second factor—whether the officers had good reason to fear that Ms. Moreno-

Toro would destroy evidence before they returned with a warrant—is equivalent to the

"exigent circumstances" exception to the warrant requirement.  *McArthur*, 531 U.S. at

331.  The Ninth Circuit recognizes that "typical exigencies" such as the destruction of

evidence arise when "the arresting officers reasonably believe that the suspects either

know or will learn at any moment that they are in immediate danger of apprehension."

*United States v. George*, 883 F.2d 1407, 1412 (9th Cir. 1989).  Accordingly, courts

generally find exigent circumstances where the police are reasonably concerned that

suspects have recognized or may recognize that a search is imminent.  *See id.* (collecting

cases).  On the other hand, courts tend to decline to find exigent circumstances in the

absence of evidence that the suspect was aware of or could soon discover the impending

search.  *See id.* (collecting cases); *see, e.g.*, *Curiel v. Cnty. of Contra Costa*, 362 F. App'x

824, 828 (9th Cir. 2010) (finding no threat to evidence because the suspects had no

suspicion of the deputies' imminent arrival); *United States v. Burleigh*, 414 F. App'x 77,

78 (9th Cir. 2011) (finding no threat to evidence because the officers' fear that

individuals potentially hiding in the warehouse could somehow be alerted to the police's

surveillance was mere speculation).

1      Here, there is no dispute that Ms. Moreno-Toro knew that a search was imminent,

2 knew what evidence the police were looking for, and knew that she had a limited amount

3 of time before the search would occur.  As such, a reasonable officer could conclude that

4 the "typical exigencies" arose, and that there was "good reason to fear" that Ms. Moreno-

5 Toro would destroy evidence before they returned with a warrant.  *George*, 883 F.2d at

6 1412; *see al-Kidd*, 131 S. Ct. at 2083; *McArthur*, 531 U.S. at 331.

7      This conclusion also applies to the state of affairs when the officers noticed Mr.

8 Zalvaza drive past them as they debriefed the Montzingos in a nearby parking lot.  (*See*

9 Wachveitl Rep. at 1; Brookes Rep. at 1.)  After all, in *McArthur*, the Supreme Court

10 found that the officers had good reason to fear the suspect would destroy the drugs at

11 issue because they "reasonably might have thought that [the suspect] realized that his

12 wife knew about his marijuana stash; observed that she was angry or frightened enough

13 to ask the police to accompany her; saw that after leaving the trailer she had spoken with

14 the police; and noticed that she had walked off with one policeman while leaving the

15 other outside to observe the trailer."  *Id.*  Similarly, the officers here reasonably might

16 have thought that Mr. Zalvaza had observed that they were meeting with the Montzingos

17 near his house and realized that both they and the Montzingos knew the generator was

18 stolen.

19      The court turns next to the third factor:  reasonable efforts to reconcile law

20 enforcement needs with the demands of personal privacy.  Courts have consistently found

21 that permitting residents to re-enter a seized dwelling with a police escort weighs in favor

22 of a finding of reasonable efforts.  *See MacArthur*, 531 U.S. at 332; *Song Ja Cha*, 597

1   F.3d at 1000.  Refraining from detaining or arresting the residents also weighs in favor of

2   reasonableness, as does refraining from searching the dwelling.  *See MacArthur*, 531 U.S.

3   at 332.

4            Here, the officers offered to allow Ms. Moreno-Toro to re-enter the house with an

5   escort if she needed to retrieve anything.  (Wachveitl Rep. at 3.)  The officers did in fact

6   allow her teenage daughter to reenter the house unaccompanied to change clothes.

7   (Warbis Rep. at 2.)  Moreover, the officers did not detain Ms. Moreno-Toro or Mr.

8   Zalvaza, but rather permitted them to leave and return at will.  (*See generally* Moreno-

9   Toro Decl.)  Although Officer Wachveitl searched the house in order to secure the

10  premises, as discussed in the following section, this sweep was independently

11  constitutional.  *See* Section III.A.3.  This sweep did not disturb Ms. Moreno-Toro's

12  belongings, because it was limited to checking places where a person could hide.

13  (Moreno-Toro Decl. ¶ 5.)  Finally, the officers kept tabs on the progress of the search

14  warrant, and as soon as they learned that the warrant would only encompass the garage,

15  they allowed the family to return to the residence.  (Brooks Rep. at 2.)  These facts all

16  weigh in favor of a finding of reasonable efforts to reconcile the seizure with Ms.

17  Moreno-Toro's personal privacy concerns.

18           The final factor considers the duration of the seizure.  This factor asks whether the

19  seizure exceeded the time reasonably necessary for police, acting with diligence, to

20  obtain a warrant.  *See Song Ja Cha*, 597 F.3d at 1000-01.  Precedent provides the

21  following benchmarks:  the Supreme Court has held that 2 hours, *MacArthur*, 531 U.S. at

22  332, and 19 hours, *Segura v. United States*, 468 U.S. 798, 801 (1984), were reasonable

1  lengths of time to obtain warrants to search a residence; the Ninth Circuit has held that 13

2  hours was reasonable, *United States v. Holzman,* 871 F.2d 1496, 1507-08 (9th Cir.

3  1989),[3] but that 26.5 hours was not, *Song Ja Cha*, 597 F.3d at 1002.

4      Here, Ms. Moreno-Toro's residence was seized for approximately 4.5 hours,

5  which falls well within the lower end of the range of durations previously held to be

6  reasonable.  (*See* Warbis Rep. (stating that the Montzingos' meeting began at 11:30

7  a.m.); Thomas Rep. at 2 (stating that Officer Wachveitl returned with the warrant at 4:30

8  p.m.)  Additionally, all of the available evidence shows that Officers Wachveitl and

9  Thomas worked diligently during that time to research, draft, and secure approval for the

10  warrant.  (*See* Thomas Rep. at 2; Wachveitl Rep. at 5.)

11      Taking into account all of these facts, the court finds that reasonable officers

12  balancing the *MacArthur* factors in the context of this case could conclude that (1) there

13  was probable cause to search the residence, (2) there was a reasonable fear that

14  destruction of evidence was imminent, (3) reasonable efforts were made to accommodate

15  Ms. Moreno-Toro's privacy concerns, and (4) the duration of the seizure was reasonable.

16  *See MacArthur*, 531 U.S. at 332.  At the very least, as the precedent cited in this section

17  shows, existing case law has not placed the question "beyond debate."  *al-Kidd*, 131 S.

18  Ct. at 2083.  Therefore, the officers are qualifiedly immune from Ms. Moreno-Toro's

19  Section 1983 claim for unreasonable seizure.

20

21

22      [3] Overruled on other grounds by *Horton v. California,* 496 U.S. 128 (1990).

### 3.  Officer Wachveitl's search

The court next considers Officer Wechveitl's warrantless entry into Ms. Moreno-Toro's house for the purpose of securing the premises pending a warrant.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Warrantless searches of the home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).  To make a lawful entry into a home in the absence of a warrant, officers must have either probable cause and exigent circumstances or an emergency sufficient to justify the entry.  *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014).  Specifically, the police must show that a warrant could not have been obtained in time, and must demonstrate "specific and articulable facts to justify the finding" of either emergency or exigent circumstances.  *Sandoval*, 756 F.3d at 1161 (quoting *LaLonde*, 204 F.3d at 957).  Additionally, a search conducted pursuant to these exceptions must be carried out in a reasonable manner.  *Id.*

To satisfy the exigency exception, the government must prove:  (1) that the officer had probable cause to search; and (2) that exigent circumstances justified the warrantless intrusion.  *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1221 (9th Cir. 2014).  Exigent circumstances include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* (citing *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc),

1  *overruled on other grounds by Estate of Merchant v. Comm'r*, 947 F.2d 1390, 1392-93

2  (9th Cir. 1991)).  Evaluating these factors in the context of the second prong of qualified

3  immunity, the court finds that a reasonable police officer could conclude that Officer

4  Wachveitl's search to secure Ms. Moreno-Toro's residence was justified by exigent

5  circumstances.  *See al-Kidd*, 131 S. Ct. at 2083.

6  As discussed above, a reasonable officer could have concluded that probable cause

7  existed to search Ms. Moreno-Toro's house.  *See* Section III.A.2.  Regarding exigent

8  circumstances, a reasonable officer also could have concluded that a search of the house

9  was necessary both to prevent the destruction of any evidence inside the house and to

10  ensure officer safety.  *See Sheehan*, 743 F.3d at 1221.  Ms. Moreno-Toro argues that,

11  once the officers required her to exit the house, there was no exigency because the

12  officers had no affirmative evidence that anyone else remained inside the house, let alone

13  anyone who intended to destroy evidence or to harm the officers.  (*See generally* Resp.)

14  Courts, however, have upheld searches based on similarly limited information.

15  For example, the Ninth Circuit found exigent circumstances where police

16  searched a hotel room in order to prevent potential destruction of evidence because,

17  although the police lacked affirmative evidence that anyone was present in the hotel

18  room, they were "[c]oncerned by the number of people who knew about the search [of a

19  nearby hotel room] and the potential that [a] suspect who initially fled might have alerted

20  accomplices to the presence of police."  *United States v. Lillard*, 357 F. App'x 70, 73 (9th

21  Cir. 2009).  Similarly, the Ninth Circuit found exigent circumstances where police, after

22  taking two suspects into custody outside their hotel room, went on to search the suspects'

1    room because the officers, despite having no affirmative evidence that other accomplices

2    were present, "were unable to view the entire room from the doorway and were uncertain

3    whether other persons, who may also have been involved with the stolen car or drugs,

4    might have been hiding in the room, closet, or bathroom." *Bailey v. Newland*, 263 F.3d

5    1022, 1033 (9th Cir. 2001).

6        Here, once the officers had inadvertently alerted Mr. Zalvaza (and later Ms.

7    Moreno-Toro) to the police's interest in the stolen generator, they were confronted with

8    the task of securing the residence without the benefit of prior surveillance.  Although the

9    officers were uncertain who else was inside the residence, they did know that one

10   occupants they had encountered was suspected of participating in a fencing operation;

11   that his wife, Ms. Moreno-Toro, was aware of both the officers' presence and their intent

12   to later search the residence for evidence of stolen power tools; and that Ms. Moreno-

13   Toro had engaged them with hostility.  (*See generally* Wachveitl Rep.; Moreno-Toro

14   Decl.)  Moreover, during the delay between Officer Brooks' initial contact with Ms.

15   Moreno-Toro and Officer Wachveitl's sweep, there was ample time for Ms. Moreno-

16   Toro to inform other occupants of the house (if any) about the officers' intentions.  (*See*

17   Brooks Rep.)  Just as in *Lillard*, the officers were concerned by the number of people

18   who knew about the impending search, as well as the potential that the suspects might

19   have alerted accomplices to the presence of the police.  *See Lillard*, 357 F. App'x at 73.

20   And, just as in *Bailey*, the officers were unable to view the interior of the residence, and

21   were uncertain whether other persons, who may have been involved with the stolen

22

1  generator and suspected fencing operation, might have been hiding in a room, closet, or

2  bathroom.  *See Bailey*, 263 F.3d at 1033.

3       The court cannot say that every reasonable officer faced with this situation must

4  conclude that the exigent circumstances exception did not justify a sweep of Ms. Moreno-

5  Toro's house.  *See al-Kidd*, 131 S. Ct. at 2083.  Although the court might, in resolving

6  the exigency question on its merits, require more of a showing that destruction of

7  evidence or harm to officers by third parties was imminent, existing precedent has not

8  placed the question "beyond debate."  *See Plumhoff*, 134 S.Ct. at 2023.  Both *Lillard* and

9  *Bailey* permit the police to sweep residences on mere suspicion of other occupants, and

10 reasonable officers relying on *Lillard* and *Bailey* for guidance could conclude that a

11 comparable exigency existed at Ms. Moreno-Toro's residence.  As such, Ms. Moreno-

12 Toro has not born her burden of demonstrating that it was clearly established that that the

13 exigent circumstances exception did not apply.  *See Camreta*, 588 F.3d at 1031.

14      Regarding the remaining requirements, the officers reasonably concluded that

15 there was no time to obtain a warrant because, as discussed above, obtaining a warrant

16 could reasonably require between four and five hours, and Ms. Moreno-Toro was already

17 on notice that a search was imminent.  Additionally, Officer Wachveitl's search was

18 reasonable.  Ms. Moreno-Toro does not dispute that the search lasted no longer than 20

19 minutes and that Officer Wachveitl only checked areas where it was possible for a person

20 to hide—for example, in closets, but not cupboards, in the shower, but not below the sink.

21 (Moreno-Toro Decl. ¶ 5.)

22

ORDER- 23

1    Taking into account all of these facts, and mindful of existing precedent such as

2    *Lillard* and *Bailey*,  the court finds that reasonable officers in this situation could have

3    concluded that (1) they had probable cause to search Ms. Moreno-Toro's dwelling, (2)

4    the exigent circumstances of destruction of evidence and officer safety were implicated,

5    (3) there was no time to obtain a warrant, and (4) a sweep of the house to check in

6    obvious hiding places was a reasonable response.  *See al-Kidd*, 131 S. Ct. at 2083.  At a

7    minimum, existing precedent has not placed the question "beyond debate."  *See id.*

8    Because it was not clearly established that Officer Wachveitl's sweep of the house was

9    unlawful, the officers are also entitled to qualified immunity on Ms. Moreno-Toro's

10   Section 1983 claim for an unreasonable search.  *See Plumhoff*, 134 S. Ct. at 2023.

11           **4.  *Monell* Claim**

12   A finding that individual public officers are entitled to qualified immunity does

13   not dispose of a claim against the municipality itself.  *See Owen v. City of Independence,*

14   *Mo.*, 445 U.S. 622, 657 (1980); *see also Ass'n for Los Angeles Deputy Sheriffs v. Cnty.*

15   *of Los Angeles*, 648 F.3d 986, 998 (9th Cir. 2011).  Accordingly, the court addresses Ms.

16   Moreno-Toro's Section 1983 claims against Lake Stevens separately from her claims

17   against the individual officers.

18   It is well-established that "a municipality cannot be held liable under § 1983 on a

19   *respondeat superior* theory."  *Monell v. Dep't of Social Servs. of City of New York*, 436

20   U.S. 658, 690 (1978).  Instead, Lake Stevens may be liable for the officers' allegedly

21   unconstitutional conduct only if Ms. Moreno-Toro demonstrates an injury resulting from

22   the "execution of a government's policy or custom."  *Dietrich v. John Ascuaga's*

ORDER- 24

1   *Nugget*, 548 F.3d 892, 900 (9th Cir. 2008).  Specifically, to establish a Section 1983

2   claim against Lake Stevens, Ms. Moreno-Toro must prove:  (1) that she possessed a

3   constitutional right of which she was deprived; (2) that Lake Stevens had a custom or

4   policy; (3) that Lake Steven's custom or policy amounts to deliberate indifference to her

5   constitutional rights; and (4) that the custom or policy was the moving force behind the

6   violation of her constitutional rights.  *See id.* (internal citations omitted); *accord Gibson*

7   *v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86, 1193-94 (9th Cir. 2002) (citing *Monell*, 436

8   U.S. at 694).

9        To date, Ms. Moreno-Toro has provided no evidence regarding a relevant custom

10  or policy held by Lake Stevens.  "[P]roof of random acts or isolated events" does not rise

11  to the level of custom or policy; only a "permanent and well-settled" practice leads to

12  municipal liability.  *Thompson v. City of L.A.*, 885 F.2d 1439, 1443-44 (9th Cir. 1989).

13  The only incident Ms. Moreno-Toro has ever discussed is her own, and this incident

14  alone does not constitute a Lake Stevens custom or policy.  *See City of Oklahoma City v.*

15  *Tuttle*, 471 U.S. 808, 823-24 (1985).  Because Ms. Moreno-Toro has failed to identify a

16  relevant custom or policy, it goes without saying that she has also failed to show that any

17  such policy was a moving force behind the alleged violation of her constitutional rights.

18  Ordinarily, on the record currently before the court, Ms. Moreno-Toro's *Monell* claim

19  against Lake Stevens would necessarily fail.

20       Defendants, however, have not specifically moved for summary judgment on this

21  claim.  The court will not grant summary judgment sua sponte on an issue to which Ms.

22  Moreno-Toro has not had an opportunity to respond.  As such, at least until the parties

ORDER- 25

1  provide further briefing on the matter, Ms. Moreno-Toro's claim against Lake Stevens

2  survives.

3  **C.     State Law Claims**

4         Turning to Ms. Moreno-Toro's state law claims, the court finds that the officers

5  are entitled to qualified immunity under Washington state law from the claims of false

6  arrest, invasion of privacy, and intentional infliction of emotional distress.  Additionally,

7  the court finds that, even if qualified immunity did not apply, Defendants are entitled to

8  summary judgment on the merits of all of Ms. Moreno-Toro's state law claims.

9         **1.   Qualified immunity under Washington law**

10        Under Washington law, an officer has qualified immunity from suit for intentional

11  torts where the officer "(1) carries out a statutory duty, (2) according to procedures

12  dictated to him by statute and superiors, and (3) acts reasonably." *Staats v. Brown*, 991

13  P.2d 615 (Wash. 2000).  Those three requirements are met in the present case.  First,

14  police officers in general act under statutory authority to enforce the state criminal laws.

15  *See* RCW 10.93.070; *McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App.

16  2000); *Goldsmith v. Snohomish Cnty.*, 558 F. Supp. 2d 1140, 1155-56 (W.D. Wash.

17  2008).  Second, the officers' reports show that they followed protocol in investigating the

18  report of stolen property and obtaining the warrant.  (*See generally* Wachveitl Rep.;

19  Thomas Rep.)  Third, as discussed above, a reasonable officer could have believed that

20  the search and seizure of Ms. Moreno-Toro's residence pending a warrant satisfied the

21  Fourth Amendment's requirement.  *See* Sections III.B.2, 3.  Therefore, the officers are

22  entitled to state law qualified immunity with respect to the false arrest, invasion of

1   privacy, and intentional infliction of emotional distress claims.  *See Luchtel v.*

2   *Hagemann*, 623 F.3d 975, 984 (9th Cir. 2010) (concluding that the officers were entitled

3   to Washington state law qualified immunity because "the officers were properly carrying

4   out a statutory duty according to the procedures dictated by Washington law and police

5   training, and . . . the officers acted reasonably.")

6      **2.  Violations of the Washington Constitution**

7      Ms. Moreno-Toro's complaint alleges that the officers' search and seizure of her

8   residence violated Article I, Section VII of the Washington Constitution, which provides:

9   "No person shall be disturbed in his private affairs, or his home invaded, without

10  authority of law."  Wash. Const. art. I § 7; (*see* Compl.)  Ms. Moreno-Toro, however,

11  appears to have abandoned this claim.  She makes no attempt to rebut or even address

12  Defendants' motion for summary judgment on this claim.  (*See* Resp.)

13     The court finds that this claim fails as a matter of law.  Absent augmenting

14  legislation, Washington courts have consistently rejected invitations to establish a cause

15  of action for civil damages due to constitutional violations.  *Blinka v. Washington State*

16  *Bar Ass'n*, , 36 P.3d 1094, 1102 (Wash. Ct. App. 2001); *Sys. Amusement, Inc. v. State*,

17  500 P.2d 1253, 1254-55 (Wash. Ct. App. 1972).  Indeed, Washington courts have

18  specifically held that there is no cause of action in tort for violations of Article I, Section

19  VII of the Washington Constitution.  *See Janaszak v. State*, 297 P.3d 723, 734 (Wash.

20  2013); *Reid v. Pierce Cnty.*, 961 P.2d 333, 342-43 (Wash. 1998).  Because Ms. Moreno-

21  Toro's claim for damages based on alleged violations of Article I, Section VII is not

22  viable, the court dismisses the claim.

### 3.  False arrest

Under Washington law, false arrest is "the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash. 1983).  "A person is restrained or imprisoned when he is deprived of either liberty of movement or freedom to remain in the place of his lawful choice." *Id.*  Defendants argue that Ms. Moreno-Toro fails to provide any evidence showing that she was "restrained" in a way that is cognizable in a claim for false arrest, and Ms. Moreno-Toro concedes the point.  (*See* Mot. at 22; Resp. at 18-21 (asking only that the court deny Defendants' motion for summary judgment on her invasion of privacy and infliction of emotional distress claims).)  Because Ms. Moreno-Toro has indicated she does not wish to proceed with her false arrest claim, the court dismisses the claim.

### 4.  Invasion of privacy

Washington recognizes a common law cause of action for invasion of privacy. *Reid v. Pierce County*, 961 P.2d 333 (Wash. 1998).  Invasion of privacy by intrusion consists of a deliberate intrusion, physical or otherwise, into a person's solitude, seclusion, or private affairs.  *Id.* "The intruder must have acted deliberately to achieve the result, with the certain belief that the result would happen." *Youker v. Douglas Cnty.*, 327 P.3d 1243, 1245 (2014) (citing *Fisher v. Dep't of Health*,  106 P.3d 836, 840 (Wash. Ct. App. 2005)).

In *Youker*, the court upheld summary judgment in favor of officers investigating a crime who reasonably believed they had received consent to search a suspect's house because "[r]easonable minds could solely conclude the deputies lacked intent to intrude

1  upon [the suspect's] seclusion." *Id.* at 1245.  The court found that, "[c]onsidering the

2  information available to them at the time, no trier of fact could find the deputies

3  deliberately embarked on a course of conduct guaranteed to result in an unlawful search

4  with the intent of causing distress or embarrassment to [the suspect]." *Id.* (citing *Fisher*,

5  106 P.3d at 840.)

6       That same reasoning applies here.  As discussed above, the officers in this case

7  reasonably believed they had authority to search Ms. Moreno-Toro's residence under the

8  exigent circumstances exception in order to preserve evidence and ensure officer safety.

9  *See* Section III.B.3.  There is no indication that the officers intended to cause Ms.

10  Moreno-Toro distress when they conducted the search; to the contrary, the evidence

11  shows that they were focused on legitimate law enforcement objectives and that they

12  made reasonable attempts to reconcile these objectives with Ms. Moreno-Toro's privacy

13  interests.  Considering the information available to the officers at the time, no trier of fact

14  could find that the officers "deliberately embarked on a course of conduct guaranteed to

15  result in an unlawful search with the intent of causing distress or embarrassment" to Ms.

16  Moreno-Toro.  *See Youker*, 327 P.3d at 1245.  As such, summary judgment on this claim

17  is appropriate.

18       **5.  Infliction of emotional distress**

19       The court interprets Ms. Moreno-Toro's generic allegations of "infliction of

20  emotional distress" to encompass claims for both intentional and negligent infliction of

21  emotional distress.  To the extent Ms. Moreno-Toro pursues a claim of intentional

22  infliction of emotional distress, she must show (1) extreme and outrageous conduct, (2)

1    intentional or reckless infliction of emotional distress, and (3) an actual result of severe

2    emotional distress.  *Kloepfel v. Bokor*, 66 P.3d 630, 632 (Wash. 2003).  Any claim for

3    intentional infliction of emotional distress must be predicated on behavior "so outrageous

4    in character, and so extreme in degree, as to go beyond all possible bounds of decency,

5    and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*

6    The court has already explained that, even taking all facts in the light most favorable to

7    Ms. Moreno-Toro, reasonable officers could find that the search and seizure of Ms.

8    Moreno-Toro's residence appropriately balanced law enforcement objectives with Ms.

9    Moreno-Toro's privacy concerns.  *See* Section III.A.  For the same reasons, a jury could

10   not reasonably find that the officers' conduct rises to the level of behavior that goes

11   "beyond all possible bounds of decency" and is regarded as "atrocious and utterly

12   intolerable in a civilized community."  *Kloepfel*, 66 P.3d at 632.  Ms. Moreno-Toro puts

13   forth no argument to the contrary.  (*See generally* Resp.)  As such, summary judgment on

14   this claim is appropriate.  *See Celotex*, 477 U.S. at 323.

15        To the extent Ms. Moreno-Toro pursues a claim of negligent infliction of

16   emotional distress, she must prove the elements of duty, breach, proximate cause, and

17   damage, plus the additional requirement of objective symptomatology.  *Kloepfel*, 66 P.3d

18   at 634.  Ms. Moreno-Toro puts zero evidence of objective symptomology before the

19   court.  (*See generally* Dkt.)  Her claim fails on that basis alone.  *See Nissan Fire*, 210

20   F.3d at 1106.

21        Moreover, under Washington's public duty doctrine, "no liability may be imposed

22   for a public official's negligent conduct unless it is shown that the duty breached was

1   owed to the injured person as an individual and was not merely the breach of an

2   obligation owed to the public in general." *Cummins v. Lewis Cnty.*, 133 P.3d 458, 461

3   (Wash. 2006).  As such, a government official will be held to owe a duty to a plaintiff

4   only if one of four exceptions applies:  "(1) legislative intent, (2) failure to enforce, (3)

5   the rescue doctrine, [or] (4) a special relationship."  *Id.*

6         Here, Ms. Moreno-Toro has made no argument and set forth no evidence showing

7   that any one of these four exceptions applies to her situation.  (*See generally* Resp.)

8   Because there is no evidence that one of these exceptions applies, it cannot be said that

9   the officers owed Ms. Moreno-Toro as an individual a specific duty.  *See Cummins*, 133

10  P.3d at 461.  Accordingly, Ms. Moreno-Toro cannot show negligence.  *See Pearson v.*

11  *Davis*, No. C06-5444RBL, 2007 WL 3051250, at *4 (W.D. Wash. Oct. 17, 2007)

12  (granting summary judgment against plaintiff on negligence claim because government

13  official owed plaintiff no specific duty); *Rengo v. Cobane*, No. C12-298TSZ, 2013 WL

14  3294300, at *2-4 (W.D. Wash. June 28, 2013) (same).  Because Ms. Moreno-Toro puts

15  forth no evidence regarding objective symptomology and no evidence showing that the

16  officers owed her a duty, summary judgment on this claim is appropriate.  *See Nissan*

17  *Fire*, 210 F.3d at 1106.

18  //

19  //

20  //

21  //

22  //

# IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment (Dkt. # 25).  The court grants summary judgment in favor of Defendants on all of Ms. Moreno-Toro's claims except her *Monell* claim against Lake Stevens, which the court reserves judgment on until it receives further briefing from the parties.

Dated this 14th day of October, 2014.


JAMES L. ROBART
United States District Judge